March 27. The Judges delivered their opinions.*
JUDGE CARR.
The Plaintiffs are the owners of a mill on Slate River; the Defendants are the “Trustees of the Slate River,” formed into a Corporation of the Act of 1819, for the purpose of improving the navigation of that river. The Act directs, among other things, that the owners of mills on the river shall, within six months after navigation shall have been completed to their mills, erect good and sufficient locks through their dams or on canals, proper and convenient around them, so as to furnish a safe and expeditious passage for loaded boats, &c. up and down the river; and moreover, shall keep the said locks in good repair, and cause some person to give constant attendance at the same, whose duty it shall be to work and manage the locks at all ‘x‘times, when thereto required by any person wishing to pass through them with craft, giving them free passage without delay; and on failure so to do, the offender, for every offence, shall forfeit $20, and be moreover liable to the party aggrieved for damages. And it is enacted, that if any owner of a mill shall fail to build such lock within eighteen months as aforesaid ; his dam is declared a nuisance, and shall be abated, thrown down and destroyed; and the Trustees are empowered and directed to clear it away at the cost of the owner. Proceeding under this Act, the Trustees have given notice to the Plaintiffs, owners of the Virginia Mills, a short distance above the mouth of Slate River, that navigation has been completed up to their mills for six months, and requiring them to proceed to the erection of *681 the locks, agreeably to the requisition of the Act. Against this proceeding, the Plaintiffs protest, as oppressive and against Law, as unconstitutional and void; and as they are liable to motions for the.S20 fine, by every one who may choose to call on them for passage, and will very soon be liable to have their dam thrown down, and irreparable injury done to their large and valuable mill establishment, they pray an Injunction, and a decision of the matter in Equity. The Injunction was granted, unless the Defendants, on being served with the order, should shew cause to the contrary, by the 10th day of the next Term. The time for answer was afterwards enlarged. The Answer was filed, much evidence on both sides taken; and the Court, upon argument, discharged the order, upon a principie which, if correctly decided, puts an end to the cause. In the argument, several questions, deep, grave and important, were raised. Some of these, I shall pass over entirely, and touch others, so far only, as seems absolutely necessary to the decision of the case. I shall do this, not from a wish to avoid trouble, but because some of the questions are too large, and open too wide a range of enquiry, for the time I have had to bestow on them.
*The first objection taken by the Appellees, was, to the jurisdiction of the Court of Chancery. The testimony I have borne on this subject, has been such, I believe, as to shield me from the suspicion of inclining to that loose practice, which, acting upon the particular case, without looking to any general rule, tends to destroy every thing like system, and to break down the barrier between Common Law and Equity. In her appropriate sphere, however, I would carefully support Equity; because I think the due exercise of her legi tímate powers, most salutary. One instance, clearly proper for the interposition of Equity, is, where the damages of a Jury would not compensate; the owner attaching some extraordinary value to the chattel sought. Such was the case of the Pusey Horn, 1 Vern. 273; the patera of the Duke of Somerset, 3 P. ffras. 389; the silver tobacco box, Fells v. Read, 3 Ves. 70, &c. Another acknowledged, and most useful ground of equitable aid, is, to prevent irreparable mischief by the destruction of property, while the right of the parties are in litigation. The cases under this head are numerous, and may be found in anjr book of reference. Waste, breaking up of meadow, of a garden, &c., are among them. In the case of Nutbrown v. Thornton, 10 Ves. 159, Lord Eldon ordered the stock, &c. on a farm, seized by the landlord under a distress for rent and bill of sale, to be specifically restored, considering that under the particular agreement it was not liable to that proceeding. He says, “Upon the particular circumstances also the Court would be justified in interposing, to prevent the destruction of the property, until the rights were ascertained, upon the principle of irreparable mischief. It is said, the Plaintiff might have damages. But, how are damages to be estimated in such a case? The directions to the Jury must be", to give, not the value of these chattels merely, but their value to this man, having this farm, enabling him to use them for cultivation,” &c.
*In the case before us, the Plaintiffs have mills, which have cost them upwards of 520,000; the dam itself, as Mr. Scott tells us, cost more than 53,000. This establishment, we are told, deals largely in wheat and the other products of the country; thereby making profit to itself, and affording to the citizens the convenience of a ready market for wheat, corn, and other articles. If the dam were destroyed by the Trustees, there would be the direct loss of its cost, the damages resulting, and the inconvenience to the public from the sudden stoppage of such an establishment; and all this mischief, being actually suffered, the mill-owner would be left to sue a Corporation for damages. It is not better to let this dam stand, and the mills go on, till the matter of right be decided? I think so, clearly; and that it is a case directly within the appropriate range of the preventive, and (if I may so say) the preservative powers of a Court of Equity.
It was next objected, that the Plaintiffs stand in the place of Taylor, who had full notice of the Law, assented to it, and aided its progress; and that he was therefore bound by it, and they equally so. Every freeholder may be said in some sort to assent to the Laws passed in a Legislature where he is represented ; but such assent, I apprehend, would not bind him, if á Law were passed conveying his property to another citizen. The assent, then, must be something more than merely standing by, and not protesting against the Law. Taylor’s rights, whatever they were, were vested rights at the passage of the Law. lie was the owner of the mills. Has he done any thing to divest those rights? If not, they still exist in the Plaintiffs, and they are legal rights, and must be so considered though brought into equity for their preservation. It is insisted, that the taking two shares of stock by Taylor, was such assent as bound him; but I cannot think that was a surrender of his legal rights. He took them on the express understanding that he was to pay for them in locks put into the river'below his mill, which were necessary for him, ^whether the river was cleared higher up, or not; which he had determined to make for his own use; and which, when he did make, he had very little idea, as he tells us, that the scheme would ever be carried into execution. The only equity this could raise against him, would be, that he stood by and saw the work going on, without objecting. But this, it seems to me, would not" be a good objection; for, till his rights were called in question, till he received notice to make the locks, it was not necessary for him to take any active step. But this objection, if applicable to Taylor, is not brought home to the Plaintiffs, by any notice. Neither do I think, that the clause in the Law, exempting Taylor, his heirs and assigns, from paying toll on property carried from his mili down the river, has the effect of binding him to *682 stand by this haw. There is no proof that he had any agency, or gave any assent to this clause. It may well be supposed to proceed from a sense of justice in the legislature, prompting them to make the owners of the mill some small return lor the many burthens the Law Ivas imposing on them.
The next objection I shall notice, is, that the Virginia Mills were not legally established. I am not sure that we can take this objection first in this Court, and in this collateral way; but the objection itself seems unfounded. The application to the Court was to build a mill, and that would seem to include every thing necessary, but especially a dam; for, if no dam had been intended, no leave of Court would have been necessary; and when we look at the Inquest, we cannot doubt fora moment, that a dam was in contemplation. The Jury are directed to enquire into the damages which may accrue from overflowing the lands above and below, and whether any mansion-house, garden, &c. will be overflowed; and that they report upon all these subjects. This would all be a farce, upon any other idea, .than that of a dam; especially on a site where there is so much fall, that a dam seventeen feet high does not throw the water a mile back.
*But it is said, that the Act of 1794, took from the County Court all power to give leave for erecting mills on Slate River, by declaring it a public highway. There certainly is no express prohibition to the County Court, to exercise the power which was vested in them by the General Law'; and the clause of the Act making the highway, is in these words: “And be it further enacted, that after the said river shall be made navigable for the passage of boats, agreeably to the provisions of this Act, the same shall be deemed and taken to be a public .highway.” This clause, it will be seen, while it admits that the river was not then navigable, or a-public highway, does not go immediately and absolutely to change its character, but only enacts, that after it shall be made navigable, under that Act, it shall be a public highway. Now, we have it in evidence, that the whole scheme contemplated by that Act, failed. No subscriptions were raised; no money paid; no labor, to speak of, bestowed. In short, the whole project was abandoned, and the Law a dead letter. The present Trustees are created under an Act passed twenty-five years after, having no reference to, or connection with, the former. I think, therefore, that no aid can be derived from this source, to impeach the power of the County Court to grant leave to build the mill.
We come now to the main question: Are the Plaintiffs bound by the provisions of the Act of 1819? Must they either erect locks, and keep due attendance at them, or have their dam destroyed as a nuisance?
The importance and delicacy of this question need not be enlarged on. It is forced upon us, and we must either meet it, or shrink from our duty.
In ascertaining the character of streams, and the power of the Sovereign over them, we .must look to the Common Law, and the operation of our own legislation. The best and most authoritative Treatise on this subject, and that indeed from which all who have written since seem to have drawn, is Lord Hale’s Tract De Jure Maris, &c., published *by Hargrave in his Law Tracts. He says, pages 8, 9: “There be some streams or rivers, that are private, not only in propriety and ownership, but also in use. as little streams or rivers that are not a common passage for the King’s people.” Again: “There be other rivers, as well fresh as salt, that are of common or public use, for carriage of boats ánd lighters, and these, whether they are fresh or salt, whether they flow and reflow, or not, are prima facie, publici juris, common highways for man or goods, or both, from one inland town to another. Thus, (he observes,) the rivers of Wey, of Severn, of Thames, and divers others, as well above the bridges and ports, as below, and as well where they are become private property, as in what parts they are of the King’s property, are public rivers, juris publici, and therefore all nuisances and impediments of passage of boats and vessels, though in the private soil of any person, may be punished by Indictment, and removed.” Again, p. 5, he says:- “Fresh rivers, of what kind soever, do of common right, belong to the owners of the soil adjacent, so that the owners of one side, have of common right the propriety of the soil, and consequently the right of fishing usque ad filum aquas; and the owners of the other side, the right of soil or ownership and fishing unto the filum aquas, on their side; and if a man be owner of the land on both sides, in common presumption, he is owner of the whole river, and hath' the right of fishing, according to the extent of his land in length. With this (he adds,) agrees the common experience.” These extracts mark with more precision than any thing I have met with in any other Common Law writer, what constitutes a public river, and the distinction between such as are public, and those which may become private property. These distinctions are supported by the cases. Lord Fitzwalter’s Case, 1 Mod. 105; Carter v. Murcot, 4 Burr. 2162; The Royal Fishery in the River Banne, Dav. Rep. 152. See, also, Palmer v. Mulligan, 3 Caines’ Rep. 307; Shaw v. Crawford, &c., 10 Johns. Rep. 236; The People v. Platt, 17 Johns. Rep. 195.
’’’At the Common Law, then, we see that some rivers were public, some private; and of those considered private, that some were subject to the servitude of the public interest, and in that sense common highways by water. The mark of distinction between those which are entirely private property, and those which are subject to the public use and enjoyment, consists in the fact, whether or not they can be used as a common passage for the public.
Applying this Common Law criterion to the Slate River, I have no doubt that it must be considered a private, innavigable stream ; and that the patent to Skelton in 1726, conveying the land on both sides, and including the river in its bounds, gave *683 him the property in the bed of the stream; and that he had, to the extent of his land, the exclusive right of fishery. But, this would give him no right to obstruct the passage of fish ; for, all the riparian owners have the same right to the enjoyment of the stream with all its advantages, and the natural run ot the fish of passage is one of these. Whether the right to the banks and bed of the stream, derived from the patent of 1726, was an absolute and exclusive right, or a right held subject to the jus publicum; in other words, whether the legislature could, at any subsequent period, have this river rendered navigable, and make it a public highway for boats and other craft, without a violation of the rights of Skelton, and those claiming under him, is one of those questions which I do not mean to discuss. The cause may be decided on other grounds. It will not be deried, I presume, that the Sovereign Power, (with us the legislature,) in whom resides this jus publicum, may, in their discretion, grant it away. It is to be taken, that they will never make this grant, but for the public benefit. Of that, however, they must be the Judges. They have the power; and the grant fairly made will bind them and their successors. The whole course of our legislation shows, that mills have at all' times been considered great public conveniences and benefits, and as such, taken under the protection, encouragement and ^regulation of the Laws: made in fact public establishments. In proof of this, various Laws may be cited; such as those regulating their tolls, their weights and measures, that they shall grind the grist in due turn, &c. Particular privileges, too, are given them. The miller is exempt (or was till lately) from militia duty. They have a right to condemn an acre of land for an abatement. They may overflow the lands of another. These privileges are forfeited, if a miller fails to keep up his mill for the case and use of his customers. A mill not regularly established by Law, is forbidden to grind for toll. All these provisions, (and others probably might be shown,) prove that mills are highly favoured; and this is wise legislation ; for, we all know, that few things contribute more to the convenience, comfort and prosperity^ of a country, than good mills well regulated. When a mill is to be established, application must be made to the Court of the County. They direct the Sheriff to take a Jury, who are to view the lands, &c. ; and among other things, to enquire, “Whether, and in what degree, fish of passage and ordinary navigation will be Obstructed; whether, by any, and by what means, such obstruction may be prevented.” What is ordinary navigation? Among the meanings assigned to the word ordinary by Johnson, I find the following: established, regular, common, usual. Ordinary navigation then, is established or regular navigation. If there be such, the Jury will report it, and the means necessary to prevent its obstruction; and leave will be given to build the mill, under such conditions as will preserve the existing navigation. If there be no ordinary navigation, there can be no obstruction. The Jury will so report; and the leave to build the mill will be without any condition as to navigation ; and this grant, I hold, will be a perfect one, vesting in the applicant all the public right, or so much at least as is necessary to the full enjoyment of the mill erected under the order. Proceeding under this idea, Nicholas, the owner of both banks and the bed of this ^private, innavigable stream, in 1802, applied to the Countj’ Court of Buckingham, for leave to build a mill. An Inquest was held, a report made, that no navigation would be obstructed, &c. Leave was given, and the mill built, which is now owned by the Plaintiffs. The evidence shows, that this mill has proved a signal benefit to the country; and all the witnesses, who speak to that point, say, that (if they cannot have both,) they had much rather have the mill without navigation, then navigation without the mill.
After this mill had thus been in successful operation for seventeen years, a Law is passed, raising a Company for the purpose of rendering the river navigable ; directing these millers (and all others, of whom there are four,) to erect locks through their dams, and keep constant attendance, to give free and ready passage; and 1 that on failure, their dams shall be destroyed as nuisances. The evidence shows, that to build such a lock at the mill of the Plaintiffs as would answer, will cost $7,000. The cost of keeping them in order, and of giving constant attendance, is not so easily estimated. It seems probable, also, that in some seasons, the water required for the locks will interfere materially with the grinding; and upon the whole, it seems doubtful whether it would not be better for the Plaintiffs to suffer their mill to go down, than to keep it up on the terms imposed by the Law. It is the decided opinion of the witnesses, that none of the other four millers on the stream above, could afford to keep up their mills on the terms of the Law. Here then, is a Law, imposing upon the citizen a burthen, which would render his property worthless, or destroying the property in case he refuses to comply. The question forces itself upon us-: Can such a Law bind? That the eminent domain of the Sovereign Power, extends to the taking private property for public purposes, I am free to admit. But then, to render the exercise of this power lawful, a fair compensation must always be made to the individual, under some equitable assessment established by *Law. This is laid down by the writers on Natural Law, Civil Law, Common Law, and the Law of every civilized country. Thus Blackstone, volume 1st, p. 139, speaking of the power of the Legislature to take private property, says, “not by absolutely stripping the subject of his property in an arbitrary manner; but by giving him a full indemnification and equivalent for the injury thereby sustained. The public is now considered as an individual, treating with an individual for an exchange. All that the Legislature does, is to oblige the owner to alienate his possessions for a reasonable price; and even this is an exertion of power, which the Legislature indulges *684 with caution, and which nothing but ,the Legislature can perform.” Far be it from me to intimate, that the, Legislature intended to violate this great principle. I am well assured that they had no such idea. They thought they were promoting the public good, without trenching at all on private right; and they may be right, and I wrong. Each of us acts under the highest sanction, and must walk by the light of our own understanding. Following this guide, I must declare it as mv solemn conviction, that whether we judge this Law by the principles of all Civilized Governments, by the Federal Constitution, or that of our own State, it is unconstitutional and void.
JUDGE) GREEN.
I concur in what has been said, as to the preliminary questions in respect to the jurisdiction of the Court of Chancery in a case like this, and the equity alleged by the Appellees, against the person under whom the Appellant claims.
After giving to this case, all the consideration demanded .by the importance of the questions which it presents, I have been led to the conclusion, after a careful examination of the legislation of England and Virginia, from Magna Charta downwards, and resorting to all other sources *of information accessible to me, that at the Common Law, as adopted here, the public have a right prima facie, notwithstanding the granting of the bed and banks to individuals, to the use of all water-courses, for the purposes of navigation, which can in any way be applied to that purpose; leaving the full use of them to the riparian owners, in any way which may be beneficial to them, until they are appropriated by the public to that object, and even afterwards, to any extent, which shall not impair the beneficial enjoyment of the public right.
It cannot however be denied, that the Sovereign Power of the State may effectually confer on individuals, by General Laws or Particular Grants, rights in opposition and paramount to this public right; and such, I think, have, by our General Laws, been vested in the owners of mills legally established, as that of the Appellants has been. This make it unnecessary to state the grounds of my opinion as to the existence of the public right; especially as my brethren decline the consideration of that question.
That the public right, if it existed, and whatever is its nature or extent, was intended to be surrendered in favor of mills legally established, to the extent of author-ising the obstruction of the stream, and the use of the water necessary for working their mills; and that with a view to the promotion of another public interest, not inferior in value to that of navigation, is, I think, clearly proved by the'whole course of our legislation.
Mills have always been treated as public establishments, subject to public control in various ways; and the building of them has been encouraged by condemning the property of others, for the use of one wishing to build, and allowing him to overflow the lands of others, upon making just compensation ; privileges, which were forfeited, if the mill was not kept up for the use and case of those who were customers to it. When the Legislature thus invited and encouraged individuals to vest their money in establishments so eminently useful to the public, it cannot be *doubted that they intended to give them an indefeasible inheritance in the property so acquired, and all its incidents and appurtenances, as complete as in the soil granted to them by their patents. This inference is fortified by the consideration, that all the Acts of Assembly of a general nature, prohibiting or directing the removal of obstructions in water-courses, uniformly except mill dams legally established. With a view to ascertain the opinion from time to time entertained by our Legislature on this point, I have examined most of the very great number of Acts of Assembly, in relation to obstructions in particular streams, used for, or devoted by Law to. the purpose of navigation, and am satisfied that the opinion of the Legislature, whenever their attention has been particularly called to the question, has conformed to that which I have expressed;' although in many cases, commencing with the Act for clearing Appomattox and Pamunkey Rivers, passed in 1752, the owners of mills are required to make locks in their dams for the passage of boats, under the penalty of subjecting the dams to be abated as nuisances. Yet, there are many indications that such provisions were sometimes considered as unjust invasions of private property, and sometimes as of doubtful character. Thus the first Act directing the abatement of dams, (that of 1745, for clearing James and Appomattox Rivers, then ordinarily navigated,) required that the owners of mills on those rivers, should make convenient locks in their dams, for the passage of boats, within a limited time, under a penalty, and on failure therein, that the dams should be abated, and the owners compensated, at the expense of such counties as should be thereby benefited, and prohibited expressly the building of dams across either of those rivers in future; thus taking away, in respect to those rivers, the power vested in the County Courts by the General Laws, to give leave to build mills which required dams. It is probable, that the Courts did not so construe it, and continued to allow mills and dams to be built; for, by an Act of January 30, *1803, this prohibition is more explicitly enacted in terms. The Act of 1787, incorporating the Appomattox Company, directs the owners of dams to make and keep up locks for the purpose of boats, and to have them well attended, under pecuniary penalties; and upon failure, au-thorises the abatement and removal of the dams, at the expense of the owners. This is the precise prototype of the provision on the same subject of the Act of 1819, under consideration, and of most of the other Acts directing the owners of dams to make locks, &c. This provision in the Act of 1787, in respect to the dams on Appomattox River, was perfectly just, and violated no private right whatever; for, the Act of 1745, presented to the owners of *685 mills the alternative, either to make locks, in their dams, or to submit to have them abated; in which case, a full compensation was provided for them. The owners of mills, then established, probably preferred the former alternative, or we should have seen a provision in some subsequent Act of Assembly, for making the compensation, which could not be made without a new Act. They were, therefore, under an obligation by compact, to keep up the locks which they had made, and as to all mill-dams subsequently built, they were not legally established, being built in opposition to the express prohibition of the Act of 1745, and were actually public nuisances. It was, therefore, an indulgence, not an injury, to them, to allow the dams to remain, upon condition of their making locks, &c. I am inclined to think, that the similar provisions found in subsequent Raws, were in a great degree founded on this example, upon the supposition that it was founded, not upon the particular circumstances existing in relation to that river, but upon an universal public right, perferable to those of mill-owners. I should indeed feel confident in this conjecture, but for the fact, that a similar provision was made at the same Session, in respect to mill-dams on Willis’s River, with this difference only, that they were not to be abated at the expense of the owners. The Acts incorporating *the James River and Potomac Companies, after authoris-ing the condemnation of lands for the use of the Company, and without saying any thing about mills, declare that it is not intended by those Acts to interfere with private property, but for the purpose of improving and perfecting the navigation ; and prohibit the use of the water by the Company, for any purpose but that of navigation, reserving to the owners, the convenience of erecting mills, forges, and other water-works.
The Act of 1794, relating to the Slate River, saves the rights of mill-owners, without intending to impair or confirm them; and the Act incorporating the Rap-pahannock Company provides a compensation to mill-owners, for the privilege of making locks in their dams.
I shall notice only one other of these Acts, relating to particular water-courses. An Act of 1810, declared Middle Island Creek to be a public highway, for an extent of near seventy miles, and directed that the owners of all mills already established, or that should thereafter be established thereon, should make slopes in their dams of prescribed dimensions, for the passage of boats and fish; and that, on failure thereof, the dams should be abated as public nuisances. At the next Session, on the representation of William M’Coy, the owner ox a mill and dam on that creek, built before the passing of that Act, another Act was passed, which declared, that the former Act was “equivalent to the abrogation of a vested right,” in respect to M’Coy’s mill, and provided, that the county of Ohio should make a full compensation to him, for the injury which he might suffer by making such a slope in his dam, before it was made. This Act is the more striking since it related to a stream, whose bed and banks were declared by the Act of 1802, to belong to the public, for the common use of all, and incapable of being granted to any individual, by any prior or subsequent patent.
The Legislative interference to prevent obstructions to the passage of fish, proceeds upon a different principle. *Such an obstruction violates no public right; for, the right of fishing in fresh water streams, or within the bonds-of any Patent, is not public and common to all, but confined to the riparian owners; each of whom is entitled to the natural run of fish of passage upwards, as he is to the natural flow of the water downwards; and at Common Law, an assize of nuisance by the party injured, lay in such a case, as “for levying a goss to intercept the course of fish coming from the sea, usque ad gur-gitem meam superiorem.” Fitz. N. B. 184, A. Whilst the Legislature, therefore, might properly yield the public right of navigation to individuals for the sake of securing the public convenience of mills, they could not justly sacrifice to this object, the individual rights in respect to the natural run of fish; and therefore, have properly guarded against such obstructions to the passage of fish, by imposing it as a condition upon the leave to build a dam, that the owner shall give a free passage to fish, and seem always to have considered it as a condition implied, even when it was not expressed.
The next enquiry is, whether the Appellants’ dam and mill have been legally established, or not? To the several objections made on this point by the Counsel, for the Appellees, an answer has been given on the other side, which, if true, puts an end to any further enquiry. It is insisted, that the uninterrupted enjoyment of a water-course, by obstructing or diverting it in any particular manner, for twenty years, as in this case, gives per se a perfect right to continue the use in the same way forever, and against all the world. This is true in respect to individuals, as to whose rights such a possession and use are adverse, upon the presumption that they have surrendered their rights by compact, and by analogy to the Statute of Limitation of the right of entry; the only remedies for such a wrong, the assize of nuisance or quod permittat, being in their nature possessory actions. Ho such presumption can arise against a public right, unless the circumstances of the case *be such as to amount to a prescription, (if there can be a prescription here,) especially against a public right not in actual use and enjoyment, so that no person has an interest in opposing the encroachment upon it. As to the public, right of navigation not in use, there can be no adversary possession; since, as we have seen, the riparian owner is permitted to make any use of the stream for his individual purposes, which does not interfere with the public right in actual use. Nor can any analogy to the Statutes of Limitations, apply to any public right; since they do not run, in any case, against the Commonwealth. The question then is, whether *686 the Appellants’ mill has been established according to the provisions of the Acts of Assembly upon this subject.
The first objection taken to it is, that the Order of Court giving leave to build the mill, does not, in terms, give leave to build a dam. In all our Laws in relation to the building of mills, up to that of 178S, the word dam is not to be found, except in the provision of the Act of 1705, prohibiting the building of a mill or dam within a mile below another mill on the same stream. On the contrary, the Acts of 1667, and 1705, do not even speak of leave to build a mill, but the leave to build the mill, as well as the dam, was left to be inferred from the condemnation of an acre of land, for the use of one wishing to build a mill. And, so as to the Acts of 1745 and 1748, which provide further for compensating the owners of lands, “which may be affected or laid under water by building such mill.” The condemnation of the acre of land, or leave to build the mill, implied permission to build the dam, which was considered as a necessary incident; and the words mill and dam, were used as synonymous. The Act of 1785, in speaking of leave to build a mill and dam, only spoke in explicit terms, what was necessarily ’implied from the terms of the former Laws; and, I think, affected no change whatever in the Law. There never was a time, when any person wishing to build a mill, was under any obligation *to apply to the Court, unless a dam was necessary. In all cases of leave to build a mill, or a mill and dam, the party has authority to build such a dam as he may think necessary and convenient for working the mill, unless the height of the dam is limited by Order of the Court; subject, however, to a liability under the Act of 1785, to compensate any individual injured thereby, for any damage done to him, which was not foreseen and estimated by the Jury.
The next objection is, that the Act of 1794, appointing Trustees for opening and improving the navigation of Slate- River, devoted it specially to the purpose of navigation, and superseded the power of the County Court of Buckingham, under the General Laws, to grant leave to build any new mill on that river. That Act was permanent and in force, when the Court gave leave to build the Appellants’ mill. The river was to be opened ; and the navigation improved by means of subscriptions, which the Trustees were authorised to receive; and the Act directed the owners of mills to make and keep up locks in their dams, and to have them properly attended, if not otherwise directed by the Trustees, under a heavy penalty; and upon failing therein, that the dams should be considered as nuisances, and liable to be abated as such. It imposed penalties upon persons who should fell trees, or fix any bridges, or stop, or place any obstruction therein. It concluded, however, with these words: 1 ‘saying to the owners of mills, their legal rights, which are not intended hereby to be impaired or confirmed.” Under this Act, no subscriptions were received; or, if any, they were paid by ■ contributions of labor. Some impediments were removed by labor furnished by the neighboring inhabitants, in a part of the river of four or five miles or more in extent; but the most important impediments, the great falls just above the site of the Appellants’ dam, were not touched. The project of improving the navigation of the river was abandoned by the Trustees; and six or eight years after, when leave was given to build the Appellants’ mill, no one in that district of *country seems to have had any idea of ever making any further attempt towards its improvement. It never was in fact navigated except by one loaded, and one empty boat, by way of experiment, and upon a swell of the river; and it was, in no sense, ordinarily navigated. I do not think that this Act impaired the power of the Court to give leave to build new mills on Slate River, or made any special reservation of the public right of navigation, in respect to this particular river. Although it directs the owners of mills to make locks, &c., it expressly reserves their legal rights, referring the question as to the extent of those rights, to the Judicial Tribunals of the country; and the prohibition of other obstructions, was nothing more than enforcing, as to this particular river, by additional penalties, the general provision of the Act of 1785, in relation to all streams. The General Laws gave power to the Courts to give leave to build mills, even when the dams might obstruct ordinary navigation; imposing such terms as the Courts might think expedient for preventing such obstruction. And a fortiori, this power could not be superseded by a contemplated future navigation. The most that can be said is, that in such case, the Court, if they were apprised of the fact, and in the exercise of the discretion given them by Law, (to give or refuse leave in all cases where the mansion-house, offices, curtilage or garden, of any proprietor will not be overflowed, or the health of the neighborhood annoyed by the stagnation of the waters,) should have imposed conditions which would have operated as a reservation of the public right of future navigation ; as they would no doubt have done, if any such future navigation had been known to be in contemplation ; or, if any one of the Trustees, or any other, had appeared and claimed such a reservation. If, in that respect they had erred, the error might have been corrected by appeal. Their judgment in the exercise of a legitimate, and (in this particular) unlimited power, is final.
^Lastly, it is insisted, that a provision of the General Mill Law of 1785, which was in force when leave was given to build this mill, operated as a reservation of the public right of future navigation, in preference to the rights of the mill-owners. That provision is in these words: “The Inquest of the said Jurors, nevertheless, or Opinion of the Court, shall not bar any prosecution or action, which any person would have had in Law, had this Act never been made, other than for such injuries as were actually foreseen and estimated by the Jury.” The Legislature, at the Revisal of 1819, changed the phrase *687 ology of this section, by enacting, that ■‘no Inquest taken by virtue of this Act, or no Opinion or Judgment of the Court thereupon, shall bar any public prosecution or private action, which coulcl have been maintained, if this Act had never heen made, other than prosecutions and actions for such injuries as were actually foreseen and estimated on such Inquest.” This seems to be legislative exposition of the before-mentioned provisions of the Act of 1785, rather than a new enactment; although it seems at first sight rather more comprehensive in its terms. Considering it in that light, I do not think it makes any reservation of the public right to appropriate the water and channel of the stream, to the purposes of navigation, in preference of the private right to maintain the dam, and to the use of the water for working a mill.
It may be admitted, that this provision was intended to guard in general, against any unexpected injury, either to individuals, or to the public; whether it be such as any of those, in respect to which the Jury are particularly charged to make enquiry, or any others. As if, for instance, the building of the dam should drown a mill belonging to another, or destroy a ford which was in, and a part of, a public highway; in the one case a private, in the other a public nuisance. Yet it could not be construed to extend to a future use of the stream, for the purposes of navigation; since the subject of navigation being specially in the mind of the '^Legislature, and a provision having been made for the security of existing and ordinary navigation, whilst nothing is said in respect to future navigation, the necessarj’ inference is, that the public rights in respect to the latter, were intended to be surrendered to the interests of individuals, for the sake of the great public interest in the establishment of mills; expressum facit cessare taciturn. And rhis seems to have been the opinion of the Legislature of 1815, indicated by the provision, that in future, every grant of leave to build a mill, should be subject to the condition, that the public should have a preferable right to the use of the water, for the purposes of navigation, and a right to make and keep a lock in the dam, (not to prostrate it,) without compensation to the owner.
The Act of 1819. incorporating the Trustees of Slate River, requires that the owners of mills shall make and keep up locks in their dams, and have them properly attended, at their own expense, forever, upon pain of pecuniary penalties, to be repeated in infinitum: and of their dams being considered as public nuisances, and abated by the Company at the expense of the owners. It manifestly impairs their rights, both in respect to tjie keeping up of their dams, and the use of the water for working their mills, in preference of the public right to use the channel and water of the stream, for the purposes of navigation.
The last enquiry, therefore, presented by this cause, is, whether the Court has a legal authority to declare so much of the Act of 1819, as impairs the private rights of the Appellants without compensation, to be void, as being in violation of the Constitution of our own State, or that of the United States.
A very liberal construction has been given to the clause of the Constitution of the United States, which prohibits any State to pass any Law impairing the obligation of contracts. It has, however, never been extended to the protection of private rights, acquired under the operation of the General Laws of the State, and without any consideration *given, beyond the general purposes of promoting individual interests directly, and the interests of the community incidental^1. JSIor do i think it can be justly extended to the protection of rights so acquired.
The Legislature of the State is declared by our Constitution to be a complete Legislature, and consequently has all the powers of Sovereignty, except so far as they are limited by the Constitutions of Virginia and the United States. Our Bill of Rights is a part of our Constitution ; and the general principles thereby declared are fundamental Laws, except so far as they are modified by the Constitution itself. They limit the powers of the Legislature, and prohibit the passing any Law violating those principles. The first Article of this declares: “That all men are by nature free and independent, and have certain inherent rights, of which, when they enter into a state of society, they cannot by any compact deprive or divest their posterity, namely, the enjoyment of life and liberty, with the means of acquiring and possessing property, and pursuing and obtaining happiness and safety.” To deprive a citizen of any property already legally acquired, without a fair compensation, deprives him quoad hoc, of the means of possessing property, and of the only means, so far as the Government is concerned, besides the security of his person, of obtaining happiness. Liberty itself consists essentially, as well in the security of private property, as of the persons of individuals; and this security of private property is one of the primary objects of Civil Government, which our ancestors, in framing our Constitution, intended to secure to themselves and their posterity, effectually, and for ever.
The Legislature, in passing the Act of 1819, did not intend to invade private rights, but proceeded, no doubt, upon the belief that the rights of the owners of mills generally, were subordinate to the public right of navigation, and particularly in respect to the Slate River; a question, on which there may well be a difference of opinion. The Constitution, *however. declares, that the Legislative and Judicial Departments, shall be distinct and separate; so that, neither shall exercise the powers properly belonging to the other. The questions, whether the rights of the owners of mills, or of the public, for the purposes of navigation, are preferred by Law generally, or in any particular case, are emphatically Judicial in their nature, depending on the effect and construction of former Laws; and, if upon a full and careful consideration, we conscientiously differ in opinion . in any par *688 ticular case from the Legislature, we are bound by the highest obligations of duty to ourselves and our country, to pursue our own judgment.
I think the order of the Chancellor should be reversed, the Injunction re-instated, and the cause remanded to be further proceeded in, in order to a final Decree.
JUDGE COALTER.
Many topics of great magnitude and interest, as well to the Commonwealth, as individuals, have been presented by the argument in this case, many of them requiring deep research and reflection.
Borne down, as this Court is, by the great mass of business on the docket, and considering that three-fourths, or more, of our time is occupied in the mere drudgery of sifting out and ascertaining matters of fact, and in examining matters of account, without the aid of a Jury, or Master Commissioner to assist us, I think, in most cases, and especially in such as that before us, we ought to confine ourselves to the fewest points of enquiry on which the case can be safely decided.
The controversy arises under the Act of Assembly, passed the 29th of January, 1819, (Sessions Acts of 1818, ch. 27,) for improving the navigation of Slate River. By that Act, a Company is incorporated to improve the navigation of that river; and for that purpose, certain powers are given them. At the passage of this Act, it was well 'known, as the fact was, that several mills had been erected on that river, and were then in use; and the 10th section of the Act provides, that the owners of these mills, and every of them, shall, within six months after the navigation shall have been completed to the said mills, erect good and sufficient locks, and keep them in good repair, &c., and cause constant attendance to be given to them, &c., under a penalty of 3520 for every failure, &c. And the 11th section provides, that if any owner of a mill shall refuse or fail to build such locks within eighteen months, then the dam is declared a nuisance, and may be abated and thrown down at the expense of the owner. .
It appears that the Company, instead of beginning below, and improving the navigation to the first mill, which is that of the Appellant, and which would have cost but a small sum, and then calling on him to build the locks, and on failure, proceeding to prostrate the dam, so as to bring up this question, so important to themselv'es, and the owners of the mills, for decision, before much expense was incurred; proceeded to expend considerable sums, to the amount of some four or five thousand dollars, in improving, the upper parts of the river. This was an unfortunate course, should it be decided that the owners of mills are not obliged to build locks; for in that case, this money must be lost, unless the Company can be permitted, and will incur the expense of erecting the locks themselves; and shall be entitled to water enough to work them.
The facts proved by the evidence in this record, present a case of a very peculiar character, as it regards the public interest, apart from the rights and interests of the individuals who are before the Court.
It appears from the testimony of about seventeen witnesses, the greater part of whom reside on, or near the river, and who are from fifty to seventy years of age, that this river passes through a bold and hilly country, and has many rapids and falls in it, some of considerable, others of minor extent and magnitude, which hitherto formed, *what had been considered insuperable obstructions to its navigation : that some fifty years ago and upwards, efforts had been made to remove some of these obstructions, but in vain, that after this, and in consequence of an Act of Assembly, passed about the year 1794, further efforts were made by voluntary associations of labor, &c. ; but the thing was finally considered on all hands, as impracticable, and was abandoned. From that time, until since the Act of 1819, no further efforts had been made.
It also appears, that one Nicholas, the then proprietor of the site on which the Appellants’ mill stands, had a mill at that place, as early as the year 1765, which was in operation during the Revolution, and perhaps for some time after; but, that it had gone down. In July, 1802, Robert Nicholas, his son and devisee, obtained an Order of Court to build a mill at the same place, and having, in September of that year, conveyed to Charles A. Scott, he proceeded to build the dam and mill, at an expense of nearly $20,000; and in 1807, sold it to Cunningham for the" sum last mentioned, under whose heir at Law the Appellants claim.
In. the mean time, also, and before the Act of 1819, four other mills have been erected, at what expense does not appear; but, considering the height of their dams, and the public utility which seems to be ascribed to them by the witnesses, it is not presumable that they can be worth less in the aggregate, than from $20,000 to $25,000. All these witnesses agree, that these mills are of much greater utility to the public, than the navigation of the river; and that if one or the other must give way, the mills ought to stand. They give the most conclusive reasons for this opinion ; and, what is remarkable, neither the opinion, nor the reasons for it, are contradicted by a single witness on the other side. They all concur too, in the opinion, that the owners of neither of them, unless indeed, by possibility, the Appellant, would be justified, if they were able, to advance the money in building the locks required by Hthe Act. The estimate of Mr. Randolph Harrison, the former Superintendent of the James River Improvements, as I understand him, would make the costs of the locks ■ necessary to be erected at the Appellants’ mill, about $7,000. If this, or any thing like it be correct, when we consider the risque, the necessary repairs, the expense of a lock-keeper, and the interest of the money, it cannot be supposed that he would be so imprudent as to encounter this expense; and the more especially, if the use of the locks should deprive his mill of the necessary supply of water during the Autumn, á season of the *689 year so important to millers. The inevitable result, as seems to be anticipated by these witnesses, is, that for a navigation, by no means good, all these mills, and all this private property, must be sacrificed, and-the country left to suffer for the want of bread, besides being deprived of a market, a very good one too as they state, for their grain and various other articles, which is now found at those mills. It seems too, that the ponds of these mills, being, of course, made at the most considerable falls, cover perhaps nearly, if not altogether, one half of the whole fall of the river; although they cover, compari-tively, but a small proportion of its bed. The witnesses, in speaking of those falls, describe most of them as rapid, abounding in large rocks, which would have to be blasted; and many of them, and amongst the number Mr. Randolph Harrison, think, as I understand them, that the style of improvement adopted on the other parts of the river, will not answer for these places; and especially, that covered by the Appellants’ mill, and the one immediately above it.
The height of the Appellants’ dam is about eighteen feet; that of the mill next above it, about thirteen feet; and there are contiguous rapids to them of about eleven or twelve feet; making a total fail, as well as I understand the testimony, of about forty-two feet in about three miles. If, then, these dams are prostrated, and the other kind of improvement will not answer the purposes of navigation, *the very dams now standing, must be again resorted to, or the work, to all useful purposes, given up.
But again. I collect from the evidence, that the aggregate height of all the dams is above fifty-eight feet; and that of the sluice dams, built by the Company, about fifty-seven feet. Thus, if those dams stand, and the locks are made and kept up by the owners, with lock-keepers, &c., the owners of mills will, at their expense, overcome one-half, and much the most difficult half, of the obstructions to the navigation, and keep it up forever, for the benefit of the Company I
Nevertheless, and however unjust to the individuals, or injurious to the public, it may be; and however truthless the procedure on the part of this body politic towards those individuals; if it was competent for the Legislature to pass the Act of 1819, it is competent for them alone to retract their Act, and put a stop to the mischief, by compensating the Company for their expenses, and re-instating both the public and private interests where they were before the Act of 1819; unless indeed, the Company should elect to make locks, and use them whenever there shall be water enough, both for them and the mill.
The question, then, between these parties, arises on conflicting Acts of the Legislature, under which, both parties have acquired rights; the various Acts concerning mills, on the one hand, and the Act of 1819, above referred to, on the other.
I will not, in this case, consider, or give any opinion, which may bear on the question, how far a mill dam, authorised to be built across a stream on which there has been ordinary navigation of some kind" or other, and where the Inquest has found that no such navigation is obstructed, or the Court has been careless in imposing proper conditions, shall be subject to the resumption, at any time, by the public, of her right to the navigation. Nor will I pass any opinion, as to the effect of the Act of 1815, in regard to its prospective operation on individual rights; *being satisfied, that it can in no way affect the rights, whatever they may be, which were previously acquired by the Appellant. Nor will I at all be understood, as having formed any opinion on the question, how far the owner of the bed of a stream having no ordinary navigation on it, but. which may hereafter be used for the purposes of navigation, either as a feeder of a canal, or by dams erected across it, shall be deprived, without compensation, of a fall and site for water-works on his land, on the ground, that before he shall have actually occupied it, as such, the public has occupied it, or is about to occupy it, as aforesaid, for navigation, whether such occupation is claimed by the public under the Act of 1815, or independently of it; the owner of this land having acquired his Patent previous to the Act of 1815. All these, and many others, are questions of deep interest, not arising in this case, and not necessary, in my humble opinion, to be decided at this time.
This case simply presents the question, whether the owner of a mill can be thus disturbed, he having erected the mill under an Order of Court, duly granted in the year 1802, to him who holds under a Patent of a very early date, granting the land, not bounded by the stream of water, but running across it, so as to convey it, water and all, so far as such a Patent can convey the public right to the water, of a stream too, on which there never was any ordinary navigation, and on which, particularly at this place, extraordinary navigation cannot exist, without the aid of dams of some kind, and perhaps of the very kind of that now erected, and in which the claim of the public to this extraordinary navigation has been asserted, long after the mill was so erected.
Not wish*ng, in this case, as I have before stated, to discuss or decide on the public right to have used this mill-site for purposes of navigation, in exclusion of the owner of the land, had this actual claim on the part of the public been consistent with the application of the owner for *an Order to erect his mill, I may at present, and without prejudice to that question, take it for granted, that an assertion of that public right, if made at that time, would have postponed the individual right; at least, so far as the necessary use of the water itself for the purposes of navigation, leaving it to the individual to elect whether he would use the residue of the water, not so necessary to navigation, for his own purposes.
Be this as it may, the Legislature had an undoubted right to abridge or modify this public right, if it existed, either by Special Acts, in each particular case, or *690 by some general provision' and regulation; especially with a view to promote the public interest m any other way.
In looking, then, to the course of legislation in regard to mills, we find them, at all times, treated of as improvements beneficial to the public. Their tolls are regulated; millers exempted from other public services, &c. &c.; and the public right to the water is only noticed', so far as regards the passage of fish, and ordinary navigation. The right to condemn the lands of others, is granted, which could only be on the ground of public utility, no right existing, by our institutions, to condemn the private property of one man to the use of another, merely on the ground that he will make a better use of it.
The Appellant’s right to the use of this water, in exclusion of the extraordinary navigation authorised by the Act of 1819, if it did not exist under his Patent, is undoubtedly secured to him under those Acts; and even if there was any irregularity in the form of the Order of Court granting the leave to erect the mill and dam, that Order has never been revised by a regular proceeding, and could not, I apprehend, be now reversed here. But I see no substantial objection to it. If his rights, thus acquired, are to be invaded for public purposes, it can only be done on the principle of making him compensation. The use of the pond, merely for navigation, I am not prepared to say ought not to be occupied by the public, although the Company *are saved the expense of erecting the dam, which creates that pond. Perhaps, this question cannot be said to arise in this case.
How far the erection of a lock in the dam by the Company, may injure the owner of the mill, by rendering his dam less secure, is a question also, which does not seem to be in issue; nor indeed, the right of the Company to use any water for their locks, which may produce an injury to the mill. But as to the latter, it may not be impertinent to say, that the principles on which I decide this case, go to secure the mill-owner against any such injury.
I think, therefore, that the Decree must be reversed.
JUDGE CABELE.
The question as to the nature and extent of the public rights to the use of watercourses, for the purposes of navigation, is one of the greatest importance to the community. But I do not deem it at all necessary to be decided in this case; and therefore I shall give no opinion upon it. Whatever those rights may be, it is competent to the Legislature to relinquish them to individuals, in any mode, and for any purpose, that they may think proper. I concur in the opinion expressed by the other Judges, that whatever rights may have belonged to the public, in relation to the navigation of Slate River, at the site of the Appellant’s mill-dam, were relinquished by the-Order of Buckingham Court, establishing that mill. And that the rights acquired under that Order, by the owners of the mill, cannot be invaded, even for public purposes, without just compensation.
I concur in reversing the Decree of the Chancellor, and re-instating the Injunction.

The Pbestdent absent.